# EXHIBIT 8

No. S-231975
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

FOTMER CORPORATION S.A.

PETITIONER

AND:

TILRAY BRANDS, INC.

RESPONDENT

**RESPONSE TO PETITION**

**Filed by:** Tilray Brands, Inc. (the "Petition Respondent")

THIS IS A RESPONSE TO the petition filed March 17, 2023.

**Part 1: ORDER(S) CONSENTED TO**

The Petition Respondent consents to the granting of the orders set out in the following paragraphs of Part 1 of the petition: NIL

**Part 2: ORDERS OPPOSED**

The Petition Respondent opposes the granting of the orders set out in paragraph 1 of Part 1 of the petition.

**Part 3: ORDER ON WHICH NO POSITION IS TAKEN**

The Petition Respondent takes no position on the granting of the orders set out in paragraphs NIL of Part 1 of the petition.

**Part 4: FACTUAL BASIS**

**Overview**

1. The Petitioner, Fotmer Corporation S.A. ("**Fotmer**"), and the Respondent, Tilray Brands, Inc. ("**Tilray**"), are parties to various agreements that set out the terms for the supply and purchase of cannabis product. The various agreements include a Raw Material Purchase Agreement (the "**RMPA**") and accompanying quality agreements.

2. The RMPA contains an expedited arbitration clause that states: "the arbitration must be completed within thirty (30) days of the appointment of the arbitrator." The RMPA also confirms that: "the arbitration will be governed by the *Arbitration Act* (British Columbia)" and that the RMPA "shall be interpreted according to the laws of British Columbia, Canada".

3. A dispute arose between the parties under the terms of the various contracts around November and December, 2022 that triggered the arbitration clause under the RMPA. Since January 2023 the parties have attempted to jointly appoint a sole arbitrator, to no avail.

4. Tilray's position is that the parties should appoint a British Columbian arbitrator, or in the alternative, a Canadian arbitrator. The RMPA specifies that British Columbia laws apply over any arbitration between the parties. A British Columbia arbitrator is the most suitable choice. Appointing an arbitrator that is not well-versed with British Columbia law would cause unnecessary delay and expense to an already short 30-day arbitration process.

5. Fotmer's position is that the arbitrator appointed should not be a national of either party. Fotmer argues that Tilray is a Canadian entity, and therefore a British Columbian arbitrator should not be appointed. Tilray denies Fotmer's characterization and maintains that Tilray is an American entity.

**The Parties**

6. Tilray is a corporation organized under the laws of Delaware, USA, that is in the business of cannabis research, cultivation, processing, and distribution. Tilray's head office is currently located in New York, New York, United States. Prior to December 2020, Tilray's head office was located in Seattle, Washington, United States.

Affidavit #1 of Mitchell Gendel, dated April 13, 2023 ["**Gendel Affidavit**"] at paras. 4-5, Ex. A and B.

7. Tilray also has subsidiary companies operating internationally, including in Canada, Portugal, and Germany. For example, Tilray Canada Ltd. ("**Tilray Canada**") is one of Tilray's subsidiaries and was incorporated on September 6, 2013.

Gendel Affidavit at para. 4, Ex. C, D. and E.

8. Fotmer is a corporation based in Uruguay that is in the business of cultivating medicinal cannabis.

**The Relevant Agreements**

9. On May 22, 2019, Tilray and Fotmer (together, the "**Parties**") entered into the RMPA.

Gendel Affidavit at Ex. F.

10. On June 18, 2019, the Parties entered into an accompanying quality agreement (the "**First Quality Agreement**"). On May 19, 2020, Fotmer and Tilray Portugal, Unipessoal Lda. ("**Tilray Portugal**") entered into another accompanying quality agreement that replaced the First Quality Agreement (the "**Final Quality Agreement**", together with the First Quality Agreement, the "**Quality Agreements**").

Gendel Affidavit at Ex. K and L.

11. Together, the RMPA and the Quality Agreements set out the terms for the supply, purchase, and expected quality of cannabis product relevant to the arbitration.

12. The RMPA includes the following express terms and conditions which were acknowledged and agreed to by the Parties:

(a) Section 9(b) confirms that Tilray "represents and warrants that (a) it is and shall continue to be a duly incorporated or formed under the laws of its jurisdiction of incorporation and formation and has the corporate or other power and authority to enter into [the RMPA] and perform its obligations [thereunder];

(b) Section 16 confirms that the RMPA "shall be interpreted according to the laws of British Columbia, Canada";

(c) Section 21 sets out the process for dispute resolution, under which:

(i) the Parties agreed that any Dispute, as defined under the RMPA, that cannot be resolved and settled in good faith pursuant to section 21(a), will proceed to arbitration by any party to the Dispute giving notice to the other party;

(ii) within fifteen (15) days from the termination of the initial mutual resolution and settlement period provided in Section 21(a), the Parties will jointly appoint one arbitrator to conduct the arbitration;

(iii) the Parties agree to proceed with such arbitration as expeditiously as is practical in the circumstances, but in any even the arbitration must be completed within thirty (30) days of the appointment of the arbitrator; and

(iv) the arbitration will be governed by the *Arbitration Act* (British Columbia);

(d) Schedule "A" Part III sets out the purchase price of product in USD; and

(e) Schedule "A" Part IV sets out discounts to the purchase price in USD.

Gendel Affidavit at Ex. F.

13. The Parties executed four amendments to the RMPA (the "**RMPA Amendments**").

Gendel Affidavit at. Ex. G - J.

14. The Quality Agreements include the following express terms and conditions which were acknowledged and agreed to by the Parties:

| Section | First Quality Agreement | Final Quality Agreement |
|---|---|---|
| 1.1(a) | Tilray Inc. is a company incorporated under the laws of Tilray and having its registered office at Suite 2400, 745 Thurlow Street, Vancouver, BC V6E 0C5 | Tilray Portugal, Unipessoal Lda. is a company incorporated under the laws of Portugal and having its registered office at Zona Industrial de Cantanhede, Lote 121, 3060-197 Cantanhede, Portugal |

| Section | First Quality Agreement | Final Quality Agreement |
|---|---|---|
| 1.1(a) | Seller is a licensed cultivator of cannabis in Uruguay under the laws of Uruguay in compliance with expectations set out in the Health Canada Cannabis Regulations (CR), good Production Practice (GPP) and EMEA Guideline Good Agriculture and Cultivation Practices (GACP) for Herbal Medicinal Products … | Seller is a licensed cultivator of cannabis in Uruguay under the laws of Uruguay in compliance with expectations set out in the Health Canada Cannabis Regulations (CR), good Production Practice (GPP) and EMEA Guideline Good Agriculture and Cultivation Practices (GACP) for Herbal Medicinal Products … |
| 2 | Definition of Regulatory Authorities: Any governmental authority in any country or group of countries competent to grant registrations for the processing and/or marketing of a pharmaceutical Product. | Definition of Regulatory Authorities: Any governmental authority in any country or group of countries competent to grant registrations for the processing and/or marketing of a pharmaceutical Product. |
| 3.2(a) | Seller is responsible to hold all legally required authorizations and licenses for the Services provided in scope of this Quality Agreement, in compliance with all applicable regulations. | Seller is responsible to hold all legally required authorizations and licenses for the Services provided in scope of this Quality Agreement, in compliance with all applicable regulations. |
| 11 | Signatures for Tilray:<br><br>André Neve[s], from Tilray Portugal, signed for Tilray | Signatures for Tilray:<br><br>André Sá Neves, from Tilray Portugal, signed for Tilray |

15. At the time that the Parties entered into the RMPA and the Quality Agreements, Tilray was the parent to a number of subsidiary corporations, including Tilray Canada, Tilray Portugal, and Tilray Deutschland GmbH.

Gendel Affidavit at Ex. C, D, and E.

16. On December 7, 2021, Fotmer and Tilray Portugal entered into a Sale and Purchase Agreement (the "**SPA**") for the supply and purchase of certain cannabis product. The Final Quality Agreement is appended to the SPA.

Gendel Affidavit at Ex. M.

**Tilray and the Historical International Regulation of Cannabis**

17. Tilray was incorporated under the laws of the State of Delaware on January 25, 2018, under the name Tilray, Inc. Tilray changed its name to Tilray Brands, Inc. in January of 2022.

Gendel Affidavit at Ex. A and B.

18. On June 20, 2018, Tilray filed its Form S-1 Registration Statement with the U.S. Securities and Exchange Commission and made an Initial Public Offering (the "**IPO**") in the United States. Tilray's affairs are governed by its amended and restated certificate of incorporation (Delaware) and amended and restated bylaws, each of which came into effect immediately prior to the completion of the IPO.

Gendel Affidavit at para. 6.

19. Around June 20, 2018, most of Tilray's executive officers were located in Tilray's Seattle offices, being:

(a) Brendan Kennedy served as Tilray's President and Chief Executive Officer and member of the board of directors, and operated out of Tilray's Seattle office;

(b) Edward Wood Pastorius, Jr. served as Tilray's Chief Revenue Officer and operated out of Tilray's Seattle office; and

(c) Mark Castaneda served as Tilray's Chief Financial Officer and operated out of Tilray's Toronto office.

Gendel Affidavit at para. 7.

20. Around this time, the processing and distribution of medical cannabis globally was heavily regulated and only 28 countries authorized the medical use of cannabis at the national or

federal level. In the United States, despite cannabis having been legalized at the state level for medical use in many states, and for adult use in a number of states, cannabis continued to be categorized as a Schedule I controlled substance under the US federal *Controlled Substances Act*, and subject to the *Controlled Substances Import and Export Act*.

Gendel Affidavit at para. 8.

21. Around 2019, when the Parties entered into the RMPA, the legal market for medical cannabis was still in its early stages. The United States did not provide a federal regulatory or legislative framework for the processing and distribution of medical cannabis. Therefore, Tilray's activity in the United States was limited to corporate and administrative services and Tilray did not produce or distribute cannabis products in the United States.

Gendel Affidavit at para. 9.

22. Instead, Tilray utilized the Canadian federal cannabis regulations. At that time, Tilray was of the view that Canadian regulations provided health care providers in countries new to medical cannabis with confidence that Tilray's products were a safe, high-quality choice.

Gendel Affidavit at para. 10.

23. Tilray sought to expand its large-scale operations to Portugal in 2018. At the time Tilray completed the IPO, Tilray held licenses to cultivate cannabis in Canada and Portugal.

Gendel Affidavit at para. 14.

**The Course of Conduct of the Parties during the Term of the RMPA**

24. When entering into the RMPA, Tilray sought to expand large-scale operations to Portugal. As a result, under the RMPA Tilray elected to purchase raw cannabis product from Fotmer and ship the product directly to its production facility in Portugal.

Gendel Affidavit at paras. 14 and 18.

25. Section 5(a) of the RMPA states:

Purchaser shall use commercially reasonable efforts to obtain all import permits required for transfer of the Product to [Tilray's] designated facility in Canada or Portugal, as applicable and elected by [Tilray] at its own cost" [*emphasis added*].

Gendel Affidavit at Ex. F.

26. The Parties drafted the RMPA to be a flexible document such that Canadian federal cannabis regulations served as a guide for the sale and purchase of medicinal cannabis, but left room for other regulations to apply. For example, all references to Canadian regulations are immediately followed with an option to apply other regulatory regimes. Examples include:

(a) Section 3(d) sets out the condition precedent that all purchase, delivery, import/export, payment, and related obligations under the RMPA are subject to and conditioned upon: one of (i) receipt of the import permit contemplated by Section 8 from Health Canada, (ii) completion of GMP certification process at Purchaser's Cantanhede, Portugal facility, or (iii) such other certification process and/or location as the Purchaser and the Supplier may agree in writing (the "**Purchaser Regulatory Readiness**") *[emphasis added]*;

(b) Section 5(c)(iii) confirms that: "within two business days after receiving the Required Import Information, [Tilray] shall apply to Health Canada or any other applicable governmental organization for the applicable Import Permit and other similar such document for the Product" [*emphasis added*]; and

(c) Section 5(c)(iv) confirms that: "both Parties shall promptly address in collaboration with each other any inquiry from Health Canada or any other applicable governmental organization with respect to obtaining the Import Permit and other similar such document for the Product" [*emphasis added*].

Gendel Affidavit at paras. 4 and 13, Ex. F.

27. In order for the Parties to comply with the Purchaser Regulatory Readiness requirement under section 3(d), Tilray obtained required import permits and Good Manufacturing Practices Certification from INFARMED. INFARMED is a Portuguese government agency accountable to the Portuguese Health Ministry that evaluates, regulates, and controls human medicines and health products.

Gendel Affidavit at para. 17

28. Pursuant to section 5(a) of the RMPA, Tilray elected to ship all of the product purchased under the RMPA to its designated facility in Portugal. Accordingly, Tilray obtained Portuguese import permits required to transfer all of product to its facility in Portugal.

Gendel Affidavit at paras 17 - 19 and Ex. N.

29. Pursuant to the RMPA and its various amendments, Tilray placed various Purchase Orders with Fotmer for the purchase of cannabis product. All of the purchase orders specify that the delivery address for the product is Tilray's facility in Portugal. All of the product ordered pursuant to the RMPA was shipped to Tilray's facility in Portugal. All amounts were quantified in USD.

Gendel Affidavit at Ex. O.

30. Fotmer sent packing lists and invoices to Tilray Portugal with respect to orders that Tilray placed pursuant to the RMPA. All amounts were quantified in USD.

Gendel Affidavit at Ex. P and Q.

**The Arbitration**

31. On December 20, 2022, Fotmer emailed Denise Faltischek and Irwin Simon, Tilray's Chief Strategy Officer and Chief Executive Officer, respectively, a written notification of a dispute between the parties (the "**Dispute Notice**") that attached a draft Notice of Arbitration describing the "**Dispute**".

Gendel Affidavit at para. 23, Ex. T and U.

32. The Dispute arises to what amounts, if any, are owing under the various agreements entered into by the Parties, and whether the quality of the product delivered met the standards contracted for under the various agreements. Tilray argues that the quality did not meet the standards contracted for, as seen in the initial quality complaint Tilray gave Fotmer on November 25, 2021. The initial quality complaint was followed by various evaluation reports and correspondence between the Parties.

Gendel Affidavit at para. 20, Ex. R.

33. Prior to Fotmer sending Tilray the Dispute Notice, on November 22, 2022, Fotmer submitted a petition to the District Court of Amsterdam for pre-judgment attachment over the shares held by Tilray in the Dutch company High Park Holdings B.V. (the "**Shares**"). In the petition, Fotmer alleged that Tilray owed Fotmer €1,500,000 under the RMPA and its various amendments. The District Court of Amsterdam granted the relief in the Petition, and Fotmer seized the Shares on December 16, 2022.

Gendel Affidavit at paras. 21-22.

34. Also prior to Fotmer sending Tilray the Dispute Notice, the majority of the correspondence from Tilray discussing amounts owing under the RMPA came from Sascha Mielcarek, Tilray's former Managing Director of Europe from Tilray's Cologne office and Arne Wilkens, Tilray's Vice President of Business Expansion from Tilray's Cologne office.

Gendel Affidavit at para. 20, Ex. S.
Affidavit #1 of Frederico Sasson, made on February 17, 2023 ["**Sasson Affidavit**"] at pgs. 87 - 97, 120 - 135.

35. At the recommendation of Fotmer, the Parties agreed to meet in person in New York, United States, on December 28, 2022 (the "**Meeting**").

Gendel Affidavit at para. 24.
Sasson Affidavit at pgs. 175-180

36. The Parties did not settle the Dispute at the Meeting.

Gendel Affidavit at para. 24.

37. Around January 4, 2023, Fotmer e-mailed a Notice of Arbitration to the following representatives at Tilray:

(a) Denise Faltischek, Tilray's Chief Strategy Officer workout out of Tilray's New York office;

(b) Irwin Simon, Tilray's Chief Executive Officer working out of Tilray's New York office;

(c) Mitchell Gendel, Tilray's General Counsel working out of Tilray's New York office;

(d) Roger Savell, Tilray's Chief Administrative Officer working out of Tilray's New York office;

(e) Helder Guerreiro, Tilray's Managing Director, Europe working out of Tilray's Cologne office;

(f) Edward Cohen, Tilray's Assistant General Counsel working out of Tilray's New York office; and

(g) André Menezes Falcão, Tilray's Counsel working out of Tilray's Portugal office.

Gendel Affidavit at paras. 26 and 27, Ex. V.

38. Paragraph 64 of the Notice of Arbitration proposed four possible arbitrators to act as sole arbitrator between the Parties, all of whom were based in the United States.

Sasson Affidavit at Ex. A.

39. On January 25, 2023, DLA Piper (Canada) LLP ("**DLA Piper**") confirmed by e-mail that Tilray had recently retained DLA Piper for the Dispute. DLA Piper confirmed Tilray's position that the arbitrator in the matter should be admitted to the bar in British Columbia.

Affidavit #1 of Wen-Shih Yang ["**Yang Affidavit**"] at Ex. A.

40. On January 25, 2023, Fotmer's counsel responded to Tilray, and stated that section 11(9) of British Columbia's *International Commercial Arbitration Act* precludes the Chief Justice from appointing a sole arbitrator who is of the same nationality as one of the parties to the arbitration, unless otherwise agreed to by the Parties. Fotmer suggested that Tilray is a Canadian entity and as such, the Chief Justice could not appoint a Canadian arbitrator.

Yang Affidavit at Ex. A.

41. On January 31, 2023, DLA Piper confirmed that Tilray is an American entity. Tilray proposed three names of potential British Columbian arbitrators, being Dan McDonald, K.C., FCIArb., Simon Margolis, K.C., and Mary Ellen Boyd.

Yang Affidavit at Ex. A.

42. Between January 25, 2023, and March 7, 2023, there were a number of exchanges between counsel for Fotmer and Tilray in an attempt to appoint an arbitrator. Unfortunately, the Parties did not find common ground. Fotmer remains of the position that the sole arbitrator should not be Canadian; Tilray remains of the position that the sole arbitrator should be British Columbian, or in the alternative, Canadian.

Affidavit #1 of Margaret MacAulay, dated March 17, 2023 ["**MacAulay Affidavit**"] at Ex. D - H.

**Arbitrator Qualifications**

43. Tilray proposes that the arbitrator appointed should have the following qualifications:

(a) Experience as an arbitrator in international commercial arbitration;

(b) Experience as an arbitrator in British Columbia commercial arbitration;

(c) Available to carry out the arbitration in the expedited 30-day time frame;

(d) Free from conflicts; and

(e) Fluent in English.

44. Tilray canvassed the availability of several British Columbian arbitrators that are experienced and qualified to sit as the sole arbitrator in this case and that meet the above qualifications. The following two arbitrators have cleared conflicts and are available for this matter:

(a) Dan McDonald, K.C. FCIArb.

(b) Simon Margolis, K.C.

**Part 5: LEGAL BASIS**

**Overview**

1. Fotmer brings this proceeding to appoint a sole arbitrator that is not a British Columbian or Canadian arbitrator under the *International Commercial Arbitration Act* (the "***ICAA***").

*International Commercial Arbitration Act,* R.S.B.C. 1996, c. 233 ("***ICAA***"), at ss. 11(5) and 11(9).

2. The crux of Fotmer's position is that the Chief Justice "must not appoint a Canadian arbitrator" because: (1) "Tilray should be considered Canadian"; and (2) Tilray's alleged Canadian nationality creates "the risk of the perception by Fotmer of partiality of a Canadian arbitrator towards Tilray".

Petition to the Court filed by Fotmer Corporation S.A. on March 17, 2023 [the "**Petition**"], at paras. 50 and 55.

3. Fotmer cannot succeed in these arguments. Tilray is a United States entity, incorporated under the laws of Delaware and headquartered in New York City. Fotmer failed to provide any case law to support their arguments otherwise. Fotmer also failed to disclose any circumstances likely to give rise to a justifiable doubt as to the independence or impartiality of a British Columbian or Canadian arbitrator.

4. The reality is a British Columbian arbitrator is the most suitable candidate in light of the circumstances, such as the law governing the merits, the nature of the dispute, the proposed arbitrators' availability, and the practical realities of the arbitration. Each circumstance will be discussed below after a discussion of Tilray's nationality.

***Tilray's Nationality is American***

5. Section 11(9) of the *ICAA* states:

> Unless the parties have previously agreed to the appointment of a sole or third arbitrator who is of the same nationality as any of the parties, the Chief Justice must not appoint a sole or third arbitrator who is of the same nationality as that of any of the parties.

6. The *ICAA* does not define "nationality". The limited Canadian case law, secondary sources, related British Columbia legislation, and international case law may assist the court to determine Tilray's "nationality".

7. The few Canadian cases that discuss nationality confirm that a corporation *prima facie* bears the nationality of the state under whose laws it is incorporated.

*Canadian Pacific Railway Company et al. (Defendants), Aplellants and the Western Union Telegraph Company (Plaintiff), Respondent*, 1889 CarswellNB 84, 17 S.C.R. 151, at paras. 20-21; *National Trust Co. v. Ebro Irrigation & Power Co.*, [1954] 1964 CarswellOnt 61 [“***Ebro***”].

8. Similarly, Halsbury’s Laws of Canada provides the following definition:

> **Nationality of corporations.** A corporate entity is a legal person created by a state within the domain of its domestic jurisdiction. International law therefore recognizes that a corporation bears the nationality of the state under whose laws it is incorporated and in whose territory it has its registered office. Given the principle of distinction between a corporation, its staff and its shareholders, the nationalities of a corporation’s shareholders and its directors do not determine the nationality of the corporation. Thus, when legal issues arise, it is the state in which the corporation is incorporated that may espouse the claim of a corporation on the international legal plane, and not the state of nationality of the shareholders or directors.

*Halsbury’s Laws of Canada - Public International Law (2023 Reissue)*, Joanna Harrington (Contributor) LexisNexis, VI. Jurisdiction, 3. Nationality as a Basis for Jurisdiction, (1) Nationality and Prescriptive Jurisdiction, HPI-77 [*“**Halsbury**”*], citing *Ebro, supra*.

9. British Columbia’s *Business Corporations Act* [“***BCA”***] provides similar definitions for a “foreign corporation”:

> **"foreign corporation"** means a corporation that
> (a) is not a company,
> (b) has issued shares,
> (c) is not required under the *Cooperative Association Act* to be registered under that Act, and
> (d) was
> > (i) incorporated otherwise than by or under an Act,
> > (ii) continued under section 308 or otherwise transferred by a similar process into a jurisdiction other than British Columbia, or
> > (iii) the result of an amalgamation under Division 4 of Part 9 or a similar process, or of an amalgamation or similar process in a jurisdiction other than British Columbia,
>
> and includes an extraprovincial corporation within the meaning of the *Financial Institutions Act*.

"**company**" means

(a) a corporation, recognized as a company under this Act or a former *Companies Act*, that has not, since the corporation's most recent recognition or restoration as a company, ceased to be a company, or

(b) a pre-existing trust company or a pre-existing insurance company;

*Business Corporations Act*, SBC 2002, c. 57, s. 1.

10. In line with the guidance above, Tilray is an American entity because at the time that the parties entered into the RMPA and the Quality Agreements: (i) Tilray was incorporated under the laws of the State of Delaware in the United States; (ii) Tilray's head office was located in Seattle; (iii) the RMPA was signed by Brendan Kennedy, Tilray's Chief Executive Officer at the time, who was based out of Tilray's Seattle office; and (iv) Tilray's registered Agent Information is located in the State of Delaware.

Gendel Affidavit at paras. 4, 7, 15, and Ex. A.

11. Fotmer argues that the *ICAA* definition of international arbitration also provides three criteria to assist the court's interpretation of "nationality", being: (1) where the parties have their place of business; (2) the location where a substantial part of the obligations of the commercial relationship is to be performed; and (3) the place with which the subject matter of the dispute is most closely connected. Fotmer does not provide case law to assist applying each factor.

12. Should these three criteria also assist the court to define "nationality", then the application of these three criteria demonstrate that Fotmer must have considered Tilray to be American, or in the alternative, Portuguese.

13. With respect to the first criteria, section 3 of the UNCITRAL 2012 Digest of Case Law on the Model Law on International Commercial Arbitration (the "**UNCITRAL Digest**") states:

> The term "place of business" has been considered in some courts to include any location from which a party participates in economic activities in an independent manner. It should thus include activities such as the establishment of a production plant, sales/marketing base, distribution, transport, or the place where the financial and administrative functions of the business are carried out.

*UNCITRAL 2012 Digest of Case Law on the Model Law on International Commercial Arbitration* (the "**UNCITRAL Digest**"), at page 62 para. 21, found at: https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/mal-digest-2012-e.pdf as cited by *Toyota Tsusho Wheatland Inc. v. Encana Corp.*, 2016 ABQB 209 at para. 32.

14. To determine "internationality" the United Nations Convention on Contract for the International Sale of Goods (Vienna, 1980) uses as a determining factor the location of the "places of business" of the parties to the arbitration agreement and states that other characteristics such as a party's nationality or place of incorporation are not determinative.

*Toyota Tsusho Wheatland Inc. v. Encana Corp.*, 2016 ABQB 209 at para. 31.

15. In this case, Tilray's "place of business" was Seattle at the time the parties entered into the RMPA and the Quality Agreements. Tilray's President and Chief Executive Officer at the time, Brendan Kennedy, signed the RMPA on behalf of Tilray; Tilray's Seattle office was the sales and marketing base; and Tilray's Seattle office was the place where Tilray's financial and administrative functions were carried out. The remaining criteria described in the UNCITRAL Digest - Tilray's production plant, distribution, and transport location - all relate to Tilray Portugal in respect of the RMPA and the Quality Agreements.

Gendel Affidavit at paras. 15 - 18.

16. With respect to the second criteria, international courts have held that the place of delivery and acceptance of goods should be considered the place where a substantial part of the obligations was performed.

*UNCITRAL Digest, supra,* page 9 para. 5, citing three cases including CLOUT case No. 20 *Fung Sang Trading Limited v. Kai Sun Sea Products and Food Company Limited*, High Court—Court of First Instance, Hong Kong, 29 October 1991, [1991] HKCFI 190.

17. In this case, Fotmer shipped **all** of the product Tilray ordered under the RMPA from Fotmer's facility in Uruguay directly to Tilray's facility in Portugal. The product never passed through Canada. Accordingly, a substantial part of the obligations were performed in Portugal and not Canada as suggested by Fotmer.

Gendel Affidavit at para. 18.

18. With respect to the third criteria, international courts have held that a dispute is most closely connected with the overall supervision and development of a project.

*UNCITRAL Digest, supra,* page 9 para. 6, citing CLOUT case No. 108 [D. Heung & Associates, Architects & Engineers v. Pacific Enterprises (Holdings) Company Limited, High Court—Court of First Instance, Hong Kong, 4 May 1995].

19. In this case, Tilray and Tilray Portugal are the two entities most closely connected with the overall supervision and development of the RMPA, the Quality Agreements, and the shipments of product under the RMPA, as demonstrated in the below facts.

(a) Tilray entered into the RMPA and the First Quality Agreement, despite Tilray Canada existing at the date of execution.

Gendel Affidavit at Ex. F.

(b) Tilray Portugal entered into the Final Quality Agreement, despite Tilray Canada existing at the date of execution.

Gendel Affidavit at Ex. L.

(c) Pursuant to subsection 9(b) of the RMPA, Tilray represented and warranted to Fotmer that "it is and shall continue to be a duly incorporated or formed under the laws of its jurisdiction of incorporation or formation and has the corporate or other power and authority to enter into this Agreement and perform its obligations [thereunder]", being Delaware, United States.

Gendel Affidavit at Ex. F.

(d) In respect of applicable regulations, the Parties drafted the RMPA flexibly to reflect the changing landscape of federal and international regulation of medicinal cannabis. At the time the parties entered into the RMPA Tilray held licences to cultivate cannabis in Portugal and Canada and Tilray was expanding its large-scale operations in Portugal.

Gendel Affidavit at paras. 10, 12, and 14.

(e) Pursuant to subsection 3(d) of the RMPA, for all of the product Tilray ordered under the RMPA, Tilray fulfilled its condition precedent to provide Fotmer with Purchaser Regulatory Readiness by obtaining Good Manufacturing Practices Certification from INFARMED, Portugal's national authority of medicines and health products.

Gendel Affidavit at para. 17.

(f) Pursuant to subsection 5(a) of the RMPA, for all of the product Tilray ordered under the RMPA, Tilray provided Fotmer with import permits authorized by Portugal.

Gendel Affidavit at Ex. N.

(g) All references to currency throughout the RMPA and the Quality Agreements are to USD.

(h) Tilray placed all purchase orders under the RMPA.

Gendel Affidavit at Ex. O.

(i) Fotmer sent packing lists and invoices to Tilray Portugal with respect to orders that Tilray placed pursuant to the RMPA, under which all amounts were quantified in USD.

Gendel Affidavit at Ex. P and Q.

(j) All regulatory references throughout the RMPA to Canadian regulations *immediately* also reference other applicable regulatory authorities, often specifically naming Portuguese regulations.

Gendel Affidavit at Ex. F.

(k) A majority of the correspondence from Tilray discussing amounts owing under the RMPA came from Sascha Mielcarek, from Tilray's Cologne office, Arne Wilkens, and from Tilray's Cologne office.

Gendel Affidavit at para. 20, Ex. S.
Sasson Affidavit at pgs. 87 - 97, 120 - 135.

20. Ultimately, it is clear that Tilray is an American entity both in fact and with respect to the relationship between the parties under the RMPA and the Quality Agreements. In the alternative, should Fotmer have viewed Tilray as an entity other than American, then the facts suggest the only other reasonable conclusion is that Fotmer viewed Tilray as Tilray Portugal. Accordingly, the Chief Justice is not prohibited from appointing a British Columbian or a Canadian arbitrator for this Dispute.

**The Law Governing the Merits - The *ICAA* and the Model Law**

21. The Parties agree that the *ICAA* governs the Dispute. The *ICAA* is based on the UNCITRAL Model Law on International Commercial Arbitration (the "**Model Law**"). Section 6 of the *ICAA* confirms that the Model Law informs the application of the *ICAA*.

*ICAA, supra*, at s. 6.

22. Section 11(8) of the *ICAA* outlines the considerations a Chief Justice must have due regard to when appointing an arbitrator, and states:

> (8)The Chief Justice, in appointing an arbitrator, must have due regard to
>
> (a)any qualifications required of the arbitrator by the agreement of the parties, and
>
> (b)other considerations as are likely to secure the appointment of an independent and impartial arbitrator.
>
> *ICAA, supra*, at s. 11(8).

23. Article 11 of the Model Law provides guidance for appointing arbitrators, including the following relevant subsections:

> (1) No person shall be precluded by reason of his nationality from acting as an arbitrator, unless otherwise agreed by the parties.
>
> …
>
> (5) …. The court or other authority, in appointing an arbitrator, shall have due regard to any qualifications required of the arbitrator by the agreement of the parties and to such considerations as are likely to secure the appointment of an independent and impartial arbitrator and, in the case of a sole or third arbitrator, shall take into account as well the advisability of appointing an arbitrator of a nationality other than those of the parties.

24. In this case, the RMPA does not provide guidance on the qualifications required of the arbitrator.

25. The UNCITRAL Digest states when a court is appointing an arbitrator, the court "will strive to appoint the most suitable candidate, not only in light of the need to secure an independent and impartial arbitral tribunal, but also in light of circumstances such as the law governing the merits, the nature of the dispute, and the proposed arbitrators' availability."

*UNCITRAL Digest, supra*, at page 62 para. 21.

26. In this case, a British Columbian arbitrator is the most suitable candidate.

**The Governing Law and the Nature of the Dispute Clearly Demonstrate a British Columbian Arbitrator Should be Appointed**

27. The Parties contracted that the RMPA shall be interpreted according to the laws of British Columbia. The Parties also contracted that any dispute under the RMPA will be resolved through arbitration that will be governed by British Columbia's arbitration legislation.

Gendel Affidavit at Ex. F, sections 16 and 21(b).

28. With respect to the applicable laws relating to the content of the dispute, the *International Sale of Goods Act*, RSBC 1996, c. 236 ["***ISGA***"] applies to the Dispute. The *ISGA* specifically incorporates the United Nations Convention on Contracts for the International Sale of Goods (Vienna, 1980) ["***CISG***"].

29. British Columbia case law informs the application of the *ISGA* and the *CISG*, including references to the interpretation of similar provisions under the *Sale of Goods Act,* R.S.B.C. 1996, c. 410 ["***SGA***"].

*Mansonville Plastics (B.C.) Ltd. v. Kurtz GmbH*, 2003 BCSC 1298 ["***Kurtz***"], at para. 83; *Pattison Outdoor Advertising Limited Partnership v. Lon LED LCC* ["**Lon LED**"], 2018 BCSC 555, at paras. 16-17, 87-89, 90-91, and 98.

30. In this case, the nature of the Dispute relates to, *inter alia,* contractual interpretation, breach of contract, breach of statutory warranty, negligent misrepresentation, and damages. As seen in *Kurtz* and *Lon LED*, Canadian case law and British Columbia

statutes inform the application of the *ISGA* and the *CISG* in international commercial with respect to these legal issues.

*Kurtz, supra,* at paras. 83-98, 134-138;
*Lon LED, supra,* at paras. 23-33, 87-91, 98-102.

31. A British Columbian arbitrator is best suited to interpret the legal issues in the Dispute. British Columbia arbitrators, and specifically the ones proposed by Tilray, are familiar with interpreting and applying the applicable domestic legislation, domestic case law, and arbitrating international commercial conflicts.

32. Appointing a British Columbian arbitrator is the most time-efficient and cost-efficient choice. Appointing an arbitrator that is not well-versed with British Columbia law or with the British Columbia arbitration process would cause unnecessary delay and expense to an already very short 30-day process.

**Tilray Proposes Two Arbitrators that are Generally Available and Qualified**

33. Tilray proposed two British Columbian arbitrators that are generally available and are qualified, being Dan McDonald, K.C. FCIArb. and Simon Margolis, K.C.

34. Fotmer appears to object to the appointment of a British Columbian arbitrator but has not provided any specific reasons for its objections other than a general “risk of the perception by Fotmer of partiality of a Canadian arbitrator towards Tilray.”

Petition at para. 55.

35. The UNCITRAL Digest discusses one Ugandan case that confirms “objections to proposed candidates had to be substantiated.”

*UNCITRAL Digest* at page 62 para. 22.

36. The *Arbitration Law of Canada: Practice and Procedure, Fourth Edition,* by J. Brian Casey states:

> The unanimous judgment of the Supreme Court of Canada in *Szilard v. Szasz* makes it clear that bias or partiality on the part of any arbitrator has no place in the commercial arbitration process in Canada…

The concept of impartiality at the time of the appointment is hard to define. It goes to the state of mind of the nominee and, unless they have taken an extremely public and adversarial position against the other party, or against a matter at issue in the arbitration, it is almost impossible, prior to the nomination and hearing to say that someone is partial.

*Arbitration Law of Canada: Practice and Procedure, Fourth Edition,* 2022, by J. Brian Casey at chapter 4.2.2 pages 160-161.

37. J. Brian Casey goes further to provide guidance to determine initial guidelines for choosing an impartial arbitrator, including the following factors that should be disclosed or considered:

(a) A significant financial interest in the dispute, a party, its counsel or a major witness or beneficiary;

(b) A close family relationship with a party, counsel, major witness or beneficiary;

(c) A significant financial involvement between the nominee’s law firm and one of the parties, witnesses or beneficiaries;

(d) A significant involvement or interest in the cause at issue;

(e) Past business relationships with a party or its counsel;

(f) Service in other arbitrations or

(g) Some distant family relationship or friendship or office sharing.

*Arbitration Law of Canada: Practice and Procedure, Fourth Edition,* 2022 at chapter 4.9.2 pages 160-161.

38. Reasonable apprehension of bias relates to “the exposure of the mind to specific and identifiable influences that are entirely extraneous to the issue to be determined, are hidden from view, and thus are unable to be addressed by the party against whom they may hold sway.”

*Tepei v. Insurance Corp. of British Columbia*, 2007 BCSC 1694, aff’d 2009 BCCA 28, para. 113.

39. In this case, Fotmer has failed to disclose any circumstances likely to give rise to a justifiable doubt as to the independence or impartiality of a British Columbian arbitrator. Fotmer has also failed to explain its perception of bias or provided specific and identifiable influences of bias.

**Summary**

40. In this case, a British Columbian arbitrator is the most suitable candidate in light of the circumstances.

(a) British Columbia law and the *CISG* govern the merits of the Dispute, with domestic law informing the application of the *CISG* and domestic law governing the procedural aspects of the arbitration;

(b) the nature of the Dispute is contractual interpretation, breach of contract, breach of statutory warranty, negligent misrepresentation, and damages, not all of which are governed exclusively by the *CISG* but are governed by domestic legislation and case law;

(c) Tilray proposed British Columbian arbitrators that are generally available and are qualified; and

(d) a British Columbian arbitrator is the most cost-effective and time-effective choice to arbitrate the already expedited 30-day arbitration.

41. Tilray asks that one of the two British Columbia arbitrators they proposed be appointed by the Court, with costs to Tilray.

**Part 6: MATERIAL TO BE RELIED ON**

1. Affidavit #1 of Wen Shih-Yang made on April 13, 2023;

2. Affidavit #1 of Mitchell Gendel made on April 13, 2023.

The petition respondent estimates that the application will take 2 hours.

| | |
|---|---|
| April 13, 2023 | Alexandra McCawley |
| Dated | Signature of ☑ lawyer for petition respondent<br>DLA Piper (Canada) LLP (Alexandra McCawley) |

| | |
|---|---|
| Petition respondent's address for service: | Alexandra McCawley<br>DLA Piper (Canada) LLP<br>Barristers & Solicitors<br>2800 Park Place<br>666 Burrard Street<br>Vancouver, BC V6C 2Z7 |
| Fax number address for service (if any): | |
| E-mail address for service (if any): | alexandra.mccawley@dlapiper.com |
| Name of the petition respondent's lawyer is: | Alexandra McCawley<br>DLA Piper (Canada) LLP<br>Barristers & Solicitors<br>2800 Park Place<br>666 Burrard Street<br>Vancouver, BC V6C 2Z7 |

No. S-231975
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

FOTMER CORPORATION
S.A.

PETITIONER

AND:

TILRAY BRANDS, INC.

RESPONDENT

---

**RESPONSE TO PETITION**

---

DLA Piper (Canada) LLP
Barristers & Solicitors
2800 Park Place
666 Burrard Street
Vancouver, BC V6C 2Z7

Tel. No. 604.687.9444
Fax No. 604.687.1612

File No.: 107521-00017 AGM/day